IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSEPH RHONE,  )
    Petitioner,  )
        ) Civil Action No. 13-637
        )
    vs.  ) Chief Magistrate Judge Lisa P. Lenihan
        )
DANIEL P. BURNS and THE ATTORNEY  )
GENERAL OF THE STATE OF  )
PENNSYLVANIA,  )
        )
    Respondents.  )

# MEMORANDUM OPINION

## I. Summation

Petitioner Joseph Rhone ("Petitioner") filed this Petition for Writ of Habeas Corpus ("the Petition") on May 15, 2013, seeking to challenge under 28 U.S.C. § 2254, his 2006 first-degree murder and conspiracy to commit murder convictions in the Court of Common Pleas of Allegheny County, Pennsylvania. See ECF No. 3. For the reasons that follow, the Petition will be denied.

## II. Relevant Factual and Procedural History

The facts of the crimes as set forth by the Pennsylvania Superior Court in Petitioner's direct appeal from his judgment of sentence are as follows:

On January 8, 2003, McKeesport police received information that Makinma Gustave ("Gustave"), [Petitioner and Yusef Rhone]'s sister, was selling drugs in a bar in the 300 block of Sixth Street. Detective Thomas Greene subsequently recovered crack cocaine from Gustave's person. Gustave was arrested for possession with the intent to deliver as well as possession of a controlled substance. The information regarding Gustave's drug dealing was provided to the police by Holmes, the victim in the instant appeal. Holmes had been a confidential informant for more than 15 years.

Testimony was presented that [Petitioner and Yusef Rhone] were aware that Holmes provided information to the police that led to their sister's arrest. On the evening after Gustave's arrest, [Petitioner and Yusef] along with their friend Darrell Collins ("Collins"), encountered Holmes as they walked along Cornell Alley. According to Collins, Yusef approached the victim and asked for a cigarette. A discussion ensued which escalated into an argument. Yusef fired a shot at Holmes who ran up the alley with [Petitioner] and Yusef chasing him. Collins fled in the opposite direction; he testified to hearing three or four more shots being fired as he ran. After a pause, Collins heard another round of shots. At trial, Collins testified that while he was in jail with Yusef, Yusef confessed that he fired a gun at Holmes.

Leonard Topley ("Topley") testified that he was at home with his stepdaughter when he heard three gunshots. Topley lives at 637 Madison Avenue, which is near Holmes' residence. As Topley walked up the driveway toward the sidewalk to investigate, he was approached by a man with a limp who grabbed him by the shoulder and said, twice, "They shot me." Topley went to call 911, and the victim tried to follow him into the house; Topley prevented him from doing so. Upon shutting the door, Topley heard three more gunshots. Topley then heard his step-daughter screaming for him to let her into the house.

Detective Joseph Osinski ("Detective Osinski") testified that he knew Holmes as an informant and was in the process of meeting Holmes after receiving repeated calls from him the day following Gustave's arrest. The detective and Holmes had arranged to meet on Madison Avenue, which was just behind where Holmes lived. At approximately 8:00 p.m., Detective Osinski left the police station; and it took him approximately three to four minutes to reach Madison Avenue. Upon approach, he heard a young female screaming. At 637 Madison Avenue, he observed a body slumping to the ground; the person was lying on the porch as the front door slammed.

The detective parked his vehicle, walked to the porch, and rolled the body over to render aid; Detective Osinski identified the body as that of Holmes. Holmes was found clutching a lighter in his hand. Paramedics arrived and Holmes was pronounced dead at 8:18 p.m. It was later determined that Holmes died as a result of gunshot wounds to the head, the left arm, and the trunk. Four spent .380 cartridge casings stamped with "PMC .380 auto," were collected at the scene.

Dr. Abdulrezzak Shakir testified that the autopsy evidence showed that Holmes was shot multiple times in the head, upper left arm, shoulder, and both thighs. It was determined that he was shot eight times and with two different guns; he was shot three times in the head and five times in the body. It was determined that the cause of death was gunshot wounds to the head and left arm. All five shots that hit the body were recovered from within the victim or his clothing. One of three shots to the head was recovered inside the victim.

Dr. Robert Levine ("Dr. Levine"), a criminalist in the Allegheny County Medical Examiner's Office and an expert in firearms, examined the ballistic evidence and determined that the five bullets that hit the victim's body were .38 caliber bullets fired with the same gun, whereas the bullet recovered from the victim's head and a bullet found at the scene were .380s that were fired by the same gun (albeit a different one that had fired the .38s). Dr. Levine testified that the .38 caliber bullets were fired by a revolver which leaves no cartridge casings, and the .380 that was used was a semiautomatic from which discharged casings are ejected from the firearm.

The Commonwealth also presented the testimony of Devin King ("King"). King stated that he was on house arrest; on the night in question, he was on his porch when he saw [Petitioner], Yusef, and Collins. King testified that as they walked by, [Petitioner] stated, "I'll make you be like your boy," and flashed a small chrome handgun in King's direction. King reported the incident with the firearm to the police. An arrest warrant was put out for [Petitioner], Yusef, and Collins charging them with terroristic threats, recklessly endangering another person, and conspiracy.

Thereafter, on January 15, 2003, Detective Andrew Schurman ("Detective Schurman") of the Allegheny County police department arrived at [Petitioner] and Yusef's residence to execute a search warrant for the premises and an arrest warrant for both men regarding the incident with King. At this time, both men were also considered persons of interest in the murder of Holmes. In Yusef's bedroom, Detective Schurman found Yusef's birth certificate and a live .380 caliber cartridge head-stamped[1] "PMC .380 auto," which is the same head stamp on the spent cartridge casings found at the scene of the murder. Additionally, a newspaper article from January 10, 2003, entitled "McKeesport Police Head Hunt for the Gunman" was found in [Petitioner]'s bedroom.

The men were transported to the McKeesport police station and waived their *Miranda*[2] rights. Detective Schurman interviewed [Petitioner] about both the incident with King and the events surrounding the shooting death of Holmes. [Petitioner] denied involvement in the incident involving King; he claimed he had not been in King's neighborhood for three months. [Petitioner] also stated that he had no knowledge of

---

[1] A head stamp is a marking on the base of each bullet casing which identifies the manufacturer and caliber of the bullet.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

Holmes' murder beyond what he had seen on television. [Petitioner] stated that Holmes had a reputation for being a "snitch" but denied knowing that his sister was arrested the day prior to Holmes' murder.

Yusef was also interviewed on this date and told detectives that he was not present during the shooting incident and was not with [Petitioner] the night Holmes was shot. Yusef, however, stated that his brother [Petitioner] had confessed to him that he had killed Holmes on January 9, 2003. Yusef denied being with [Petitioner] on the night Holmes was shot.

The following day, January 16, 2003, an arrest warrant was secured for [Petitioner] for the murder of Holmes; he was arrested at the Allegheny County Jail for the death of Holmes. After being read his <u>Miranda</u> warnings, [Petitioner] again waived his rights and agreed to speak with the detectives. The officer explained that his brother had provided information implicating him and that his [cousin] Markita Nixon, had shot a man on the North Side three days prior with a .380 caliber silver handgun. [Petitioner] then stated he wanted to tell his side of the story.

[Petitioner] explained that he encountered Holmes on Cornell Alley and stated that Holmes confronted him regarding fake crack cocaine that [Petitioner] had sold him some six months earlier. [Petitioner] claimed that Holmes reached for a gun in his waistband, which [Petitioner] eventually wrestled away from Holmes. [Petitioner] shot Holmes twice; and as Holmes got up and ran, he shot him twice more. [Petitioner] then put this version of the events in writing and provided it again on tape.[3] [Petitioner] later admitted to the police that the used a .380 caliber semi-automatic weapon which fit the description of the gun used to threaten King. [Petitioner] indicated that he shot at the victim four times, but it was clear from physical evidence that Holmes was shot eight times and by two different guns.

On September 28, 2005, the Allegheny County Police obtained an arrest warrant for Yusef, charging him with the murder of Holmes. Yusef waived his <u>Miranda</u> rights and admitted to being an eyewitness when Holmes was shot on Cornell Alley on January 9, 2003 but stated that he was not the shooter. Yusef stated that two weapons were used, a black .380 and a silver .38. Yusef also admitted that Holmes had a reputation for being a "snitch." Yusef had heard that Holmes had "snitched" on their sister. Yusef also admitted to previously providing the police with a different version of events on January 15, 2003. Yusef stated that [Petitioner] gave him a .380 weapon and asked him to "get rid of it for him." Yusef put the gun into a bag and took it to his sister's house.

After this version was taped, Yusef indicated he wanted to again change his statement as it was not the entire truth. Yusef again agreed to place his admissions on audiotape. During the recorded session, he implicated himself and admitted to having more of a role in the incident. In his second statement, Yusef admitted that he fired the first shot at

---

[3] [Petitioner]'s audiotaped statement was played for the jury.

Holmes with a .38 revolver. Yusef stated that he fired this gun until it clicked empty, which he thought was three to four shots. Yusef stated that he fired a .38 caliber weapon in Holmes' direction but explained that he did not intend to harm Holmes, but only wanted to frighten him. He stated that the shots he fired at Holmes were "low" and that he ran away after firing the weapon and that his brother chased Holmes. Yusef also stated that [Petitioner] had asked him to "get rid of" the .380 for him so he hid it on the side of his sister's house in the bushes. Yusef claims that he has "no idea" what happened to the .38 weapon.

[Petitioner] was charged with one count of criminal homicide. On March 15, 2004, he filed an omnibus motion seeking to suppress statements made to the police. After multiple changes of counsel, a hearing on the motion to suppress was held; the motion was denied. On July 14, 2005, the matter was re-opened upon the request of the defense, and an additional hearing was held wherein [Petitioner] testified. On July 28, 2005, the motion was again denied. On May 1, 2006, the Commonwealth filed a motion to amend the criminal information, seeking to add one count of criminal conspiracy. The motion was granted. Yusef was charged with one count of criminal homicide and one count of criminal conspiracy to commit murder.

On May 2, 2006, a joint jury trial was held before the Honorable John A. Zottola. On May 5, 2006, the jury found both [Petitioner] and Yusef guilty of murder and conspiracy. On July 24, 2006, both men were sentenced to life imprisonment without parole for first degree murder as well as a concurrent life sentence for conspiracy. [Petitioner] and Yusef each filed post-sentence motions challenging the sufficiency and weight of the evidence. Judge Zottola denied the motions. Thereafter, both men filed timely notices of appeal.

ECF No. 8-4 at 2-10 (internal citations to record omitted).

On September 25, 2006, Petitioner filed a Notice of Appeal to the Superior Court of Pennsylvania. See ECF 8-2. On February 28, 2007, he filed a Concise Statement of Matters Complained of on Appeal pursuant to Pa. R.A.P. 1925(b), claiming:

1. The trial court erred by denying [Petitioner]'s motion to suppress statements made by [Petitioner] when the statements were not knowingly, intelligently and voluntarily made;

2. The trial court erred in failing to suppress the affidavit of probable cause in that said affidavit was not supported by probable cause;

3. The trial court erred in denying [Petitioner]'s motion for judgment of acquittal pursuant to Pa. R. Crim. P. 606 in that the evidence presented by the Commonwealth was insufficient to sustain its burden of proving [Petitioner] guilty beyond a reasonable doubt of the charged offenses for which he was convicted;

5

4. The trial court erred in denying [Petitioner]'s motion Challenging the Weight of the Evidence pursuant to Pa. R. Crim. P. 607 where [Petitioner]'s conviction was so contrary to the evidence presented so as to shock one's sense of justice;

5. The trial court erred in failing to properly instruct the jury regarding the defense of abandonment of conspiracy; and

6. The search warrant, which authorized the search of the [Petitioner]'s residence, was over-broad.

See ECF No. 8-1 at 27-28.

On September 20, 2007, Judge Zottola filed his Opinion. See id. at 26-33. By Memorandum Opinion dated July 17, 2008, the Superior Court affirmed Petitioner's judgment of sentence. See ECF No. 8-4 at 1-26. On August 15, 2008, Petitioner filed a Petition for Allowance of Appeal to the Pennsylvania Supreme Court; that Petition was denied by on April 1, 2009. See id. at 27-29; ECF No. 8-5; ECF No. 8-6.

On March, 25, 2010, Petitioner filed a *pro se* petition for relief pursuant to Pennsylvania's Post Conviction Relief Act (PCRA), 42 Pa. Const. Stat. § 9541. In it he raised the following claims:

1. Trial counsel was ineffective for failing to object to the introduction of a redacted audiotape of [Yusef's] confession implicating [Petitioner] and requesting a limiting or cautionary instruction.

2. Trial counsel was ineffective for failing to argue that confession seized after the police possessed probable cause to arrest Petitioner was obtained by exploiting information learned during initial illegal arrest.

3. Trial counsel was ineffective for not objecting to the admission of prior bad act evidence and requesting a limiting or cautionary instruction.

4. Trial counsel was ineffective for failing to object to erroneous/inadequate jury instructions.

5. Trial counsel was ineffective for not challenging the illegal sentence imposed by the sentencing court.

6

6. Trial counsel was ineffective for failing to correct the trial court's prohibiting of the jury to make written notes during trial.

7. Trial counsel was ineffective for failing to request severance due to antagonistic defenses.

8. Trial counsel was ineffective for not objecting to the prosecutor's deliberate misrepresentation of facts during trial.

See ECF No. 8-7.

On June 30, 2010, Judge Zottola appointed Joseph F. McCarthy III, Esquire, to represent Petitioner in his collateral appeal. Petitioner filed a *pro se* Motion to Supplement his PCRA Petition on January 10, 2011, which included an additional claim that trial counsel was ineffective for failing to impeach a Commonwealth's witness with his prior inconsistent statements and introducing them as substantive evidence. On November 17, 2011, Petitioner filed another *pro se* Motion to Supplement his PCRA Petition, which included an additional claim that the prosecutor violated the Constitution of the Commonwealth of Pennsylvania and/or the United States' laws or Constitution, by failing to charge Petitioner with the weapon alleged in the murder and this failure so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

On January 19, 2012, Judge Zottola entered an order appointing Charles Pass III, Esquire, to represent Petitioner in place of Attorney McCarthy. On February 24, 2012, Attorney Pass filed a Motion for Leave to Withdraw as Counsel under Commonwealth v. Turner, 544 A.2d 927 (Pa. 1988), and Commonwealth v. Finley, 550 A.2d 213 (Pa. Super. 1988) (en banc). See ECF No. 8-8 at 1-41. Over Petitioner's objections, the PCRA court granted Attorney Pass's Motion to Withdraw and entered an order pursuant to PA. R. Crim. P. 907, giving notice of its intent to dismiss Petitioner's PCRA petition. See id. at 42-52. By an order entered March 26, 2012, the

PCRA court dismissed Petitioner's PCRA petition after determining that Petitioner had no meritorious issues or claims. See ECF No. 8-9 at 5-6. Judge Zottola filed the corresponding Opinion on June 25, 2012. Id.

The Petitioner filed a *pro se* Notice of Appeal to the Pennsylvania Superior Court on April 19, 2012, and on September 21, 2012 filed his brief with the Superior Court, presenting the following claims:

1. That the PCRA Court erred in dismissing [Petitioner]'s PCRA petition as meritless on the grounds that the violation of [Petitioner]'s confrontation rights under the Sixth Amendment was harmless beyond a reasonable doubt.

2. That the PCRA Court erred in dismissing [Petitioner]'s PCRA petition as meritless on the grounds that the trial counsel was not ineffective in failing to address issues related to [Petitioner]'s unlawful arrest on misdemeanor charges not committed in the officer's presence, thus, challenging the tainted information obtained as a result of the unconstitutional arrest.

3. That the PCRA Court erred in dismissing [Petitioner]'s] PCRA petition as meritless on the grounds that trial counsel was not ineffective for not objecting to the inadequate and erroneous malice instruction in regards to third-degree murder.

See ECF No. 9 at 7-60.

On February 15, 2013, the Pennsylvania Superior Court issued a Memorandum Opinion, affirming the PCRA court's decision to deny post-conviction relief. See ECF No. 8-11 at 10-27. Petitioner did not file a petition for allowance of appeal to the Supreme Court.

On May 15, 2013, Petitioner filed his Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 with this Court raising the following three claims:

1. Trial Counsel was ineffective for failing to object to statements made during trial by his co-defendant, Yusef, in violation of his Confrontation Clause rights pursuant to Bruton v. United States, 391 U.S. 123 (1968).

2. Trial Counsel was ineffective for failing to suppress Petitioner's confession on the grounds that it was obtained during Petitioner's unlawful arrest for a separate misdemeanor.

3. Trial Counsel was ineffective for failing to request a limiting or cautionary jury instruction when the Commonwealth admitted evidence of other prior bad acts including the testimony of Devon King and evidence that Petitioner's cousin, Markita Nixon, shot someone with a .380 caliber pistol three days before Holmes's murder occurred.

See ECF No. 3.

On May 21, 2013, this Court issued an Order directing the Commonwealth to respond within twenty-one days of receiving the Order. See ECF No. 5. Respondents filed an Answer to the Petition on June 16, 2013. See ECF No. 8.

### III. Standard of Federal Habeas Corpus Review

This case is governed by the federal habeas statue applicable to state prisoners, 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA"). Under this statue, habeas relief is only available on the grounds that Petitioner's judgment of sentence was obtained in violation of his federal constitutional rights. 28 U.S.C. § 2254(a). Errors of state law are not cognizable. See, e.g., Preister v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004) ("Federal courts reviewing habeas claims cannot 'reexamine state court determinations on state-law questions.'") (quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)). See also Real v. Shannon, 600 F.3d 302, 309-10 (3d Cir. 2010).

AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 687, 693 (2002). It "requires federal courts collaterally reviewing state proceedings to afford considerable deference to state

9

courts' legal and factual determinations." Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004). As codified at 28 U.S.C. § 2254(d), AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was *contrary to,*[4] *or involved an unreasonable application of,*[5] *clearly established Federal law, as determined by the Supreme Court of the United States*; or
>
> (2) resulted in a decision that was based on *an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.*[6]

(Emphasis added).

---

[4] "The test for § 2254(d)(1)'s 'contrary to' clause is whether the state court decision 'applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it contradicts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result.' Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams v. Taylor, 529 U.S. 362, 405 (2000), and Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)). Of course, a state court's resolution of a question that the Supreme Court has not resolved can be neither contrary to, nor an unreasonable application of, the Court's precedent. See Kane v. Garcia Espitia, 546 U.S. 9 (2005)." Roundtree v. Balicki, 640 F.3d 530, 537 (3d Cir. 2011) (bracketed text in original) (parallel citations omitted).

[5] "The test for § 2254(d)(1)'s 'unreasonable application of' clause is as follows: '[a]n 'unreasonable application' occurs when a state court 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case.' Rompilla v. Beard, 545 U.S. 374, 380 (2005) (quoting Wiggins v. Smith, 539 U.S. 510, 519-20 (2003)). For purpose of § 2254(d)(1), '[i]t is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous.' Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (internal quotations omitted). "Under §2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' Id. at 75-76 (quoting Williams v. Taylor, 529 U.S. 362, 411 (2000)). Rather, '[t]he state court's application of clearly established law must be objectively unreasonable' before a federal court may grant the writ. Andrade, 538 U.S. at 75." Roundtree, 640 F.3d at 537 (parallel citations omitted).

[6] "The test for § 2254(d)(2)'s 'unreasonable determination of facts' clause is whether the petitioner has demonstrated by 'clear and convincing evidence,' § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record. See Rice v. Collins, 546 U.S. 333, 338-39 (2006) ('State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'")(quoting § 2254(e)(1)) (citing Miller-El v. Dretke, 545 U.S. 231, 240 (2005)). See also Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009) ('Under the § 2254 standard, a district court is bound to presume that the state court's factual findings are correct, with the burden on the petitioner to rebut those findings by clear and convincing evidence.'). Importantly, the evidence against which a federal court measures the reasonableness of the state court's factual finding is the record of evidence at the time of the state court's adjudication. Cullen v. Pinholster, - U.S. – [ ], 131 S. Ct. 1388, 1401-03 (2011)." Roundtree 640 F.3d at 537-38 (parallel citations omitted).

10

Importantly, regardless of whether a state court has adjudicated a claim on the merits so as to invoke review under the standard set forth in 28 U.S.C. § 2254(d), a federal habeas court must presume that all of the state court's factual findings are correct unless the presumption is rebutted by clear and convincing evidence. See e.g., Palmer v. Hendricks, 592 F.3d 386, 392 (3d Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)). See also Weeks v. Snyder, 219 F.3d 245, 259 (3d Cir. 2000) (quoting Marshall v. Longberger, 459 422, 434 (1983), for the proposition that habeas review does not permit a federal court to re-determine the credibility of witnesses whose demeanor has been observed by the state court); Miller-El v. Cockrell, 537 U.S. 322, 339-41 (2003).

The provisions of the federal habeas corpus statue at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief. To comply with the exhaustion requirement, a state prisoner first must have fairly presented his constitutional and federal law issues to the state court through direct appeal, collateral review, state habeas proceedings, mandamus proceedings, or other available procedures for judicial review. See, e.g., Castille v. Peoples, 489 U.S. 346, 351 (1989); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996); Burnett v. Love, 89 F.3d 135, 137 (3d Cir. 1996). Moreover, a petitioner must present every claim raised in the federal petition to the state's trial court, intermediate appellate court and highest court before the exhaustion requirement will be considered satisfied. O'Sullivan v. Boerckel, 526 U.S. 838 (1999). Petitioner has the burden of establishing that exhaustion has been satisfied. Ross v. Petsock 868 F.2d 639, 643 (3d Cir. 1989); O'Halloran v. Ryan, 835 F.2d 506, 508 (3d Cir. 1987).

Exhaustion is not a jurisdictional limitation, and federal courts may review the merits of a state prisoner's claims prior to exhaustion when no appropriate state remedy exists. See Christy

v. Horn, 115 F.3d 201, 206 (3d Cir. 1997); Doctor, 96 F.3d at 681; Carter v. Vaughn, 62 F.3d 591, 594 (3d Cir. 1995). A petitioner shall not be deemed to have exhausted state remedies, however, if he has the right to raise his claims by any available state procedure. 28 U.S.C. § 2254(c). An application for a writ of habeas corpus may be denied on the merits, however, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State. 28 U.S.C. § 2254(b)(2). Petitioner's claims will be reviewed in accordance with the standards set forth above.

## IV. Analysis of Petitioner's Claims

Petitioner's habeas petition contains three claims of ineffective assistance of counsel related to: (1) a Bruton[7] Violation (2) Failure to Suppress a Confession Obtained through an Unlawful Arrest and (3) Failure to Request a Limiting or Cautionary Jury Instruction Regarding Evidence of Prior Bad Acts.

In Strickland v. Washington, 466 U.S. 668, 687 (1984), the United States Supreme Court formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance. To prevail on his claims, Petitioner must demonstrate that (1) counsel's performance was unreasonable; (2) and that counsel's unreasonable performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Relief will not be granted unless the petitioner makes both showings. Id.

As to the first prong, to determine whether counsel's performance was "reasonable", a court must assume a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance under the totality of the circumstances. Id.

---
[7] Bruton v. United States, 391 U.S. 123 (1968).

12

The Court should objectively seek to determine whether counsel exercised the customary skill and knowledge that normally prevail under similar circumstances, not whether the defense was free from errors of judgment. Id.

The second prong of the Strickland test requires the petitioner to demonstrate that counsel's errors deprived him of a fair trial and the result was "unfair or unreliable." Id. at 689. To prove an "unfair or unreliable" result, the petitioner must show that there is a reasonable probability that, *but for* counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694 (emphasis added). A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. Id.

Therefore, Petitioner must demonstrate that (1) counsel failed to exercise customary skill and knowledge that normally prevails under similar circumstances and (2) but for the aforementioned unprofessional errors, there is a reasonable probability that the result would have been different.

   A. Ineffective Assistance of Counsel: Bruton Violation

Petitioner first asserts that his trial counsel was ineffective for failing to object when the Commonwealth played recorded testimony of a non-testifying co-defendant, Yusef, to the jury, which implicated Petitioner. Petitioner contends that his counsel's failure to object to the admission of Yusef's testimony violated Petitioner's Confrontation rights pursuant to Bruton v. United States, 391 U.S. 123 (1968), and that he was severely prejudiced by the introduction of the testimony. See ECF No. 4 at 13. Accordingly, Petitioner requests habeas relief because he alleges the state court's decision, denying relief for ineffective assistance of counsel, involved an unreasonable application of clearly established federal law. Id. at 7.

In Bruton, the United States Supreme Court held that if a non-testifying co-defendant's confession implicates a criminal defendant, the admission of the co-defendant's confession violates the defendant's rights under the Sixth Amendment's Confrontation Clause. See Bruton v. United States, 391 U.S. 123 (1968). While at first glance it appears Petitioner may have a viable claim, the Pennsylvania Supreme Court refined the reach of Bruton in Commonwealth v. Wharton, 607 A.2d 710 (Pa. 1992). Id. at 718 (quoting Schneble v. Florida, 405 U.S. 427 (1972) (holding that a conviction obtained in violation of the Bruton doctrine could stand because violation was a "harmless error")).

In accordance with the United States Supreme Court's decision in Schneble v. Florida, 405 U.S. 427 (1972), the Pennsylvania Supreme Court held:

> The mere finding of a violation of the [Bruton] rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction. In some cases, the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the co[-]defendant's admission is so insignificant in comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.

Commonwealth v. Wharton, 607 A.2d at 718.

In denying this claim the Pennsylvania Superior Court echoed the PCRA court's assessment that even if a Bruton violation occurred, it was a harmless error, in that the properly admitted evidence of guilt, including Petitioner's recorded confession,[8] was so overwhelming that the prejudicial effect of the co[-]defendant's admission was insignificant. See ECF No. 8-11 at 12. Petitioner, himself, admitted that his confession was "the bedrock of the [C]ommonwealth's case against him." ECF No. 4 at 26. Accordingly, trial counsel was not

---

[8] [Petitioner] testified that "he and the victim struggled over the victim's gun, [Petitioner] wrestled the gun away from the victim, shot at the victim twice, and, as the victim got up and was running away, [Petitioner] shot at the victim twice more." ECF No. 8-8 at 16.

14

ineffective by failing to object because any Bruton violation was harmless beyond a reasonable doubt.

Based on the above, Petitioner fails to show that his trial counsel performed in a constitutionally ineffective manner and that he was prejudiced by counsel's failure to object to the admission of the testimony. See Strickland v. Washington, 466 U.S. 668, 687 (1984). Since Petitioner's trial counsel was not ineffective pursuant to Strickland, the state court's decision to deny relief was neither "contrary to" nor did it or involve "an unreasonable application of, clearly established Federal law", AEDPA, 28 U.S.C. § 2254(d) (2012).[9] Thus, Petitioner is not entitled to habeas relief on this claim.

B. Ineffective Assistance of Counsel: Unlawful Arrest and Tainted Confession

Second, Petitioner claims that he was unlawfully arrested on January 15, 2003, on misdemeanor terroristic threat charges, and therefore a confession he made following his January 16, 2003 homicide arrest should have been suppressed. In addition, Petitioner argues that his confession was not voluntary because Yusef provided information that was "the catalyst used to compel Petitioner's confession." ECF No. 4 at 23. Consequently, Petitioner claims that his trial counsel was ineffective because he "failed to effectively litigate the suppression of [Petitioner's confession of Holmes's murder] [.]" ECF No. 3-1 at 3.

On March 15, 2004, Petitioner filed an omnibus motion seeking to suppress statements he made to police. See ECF No. 8-4 at 9. The trial court held a hearing on April 22, 2005 and denied the motion. See id. On July 14, 2005, the same issue was re-opened upon the request of

---

[9] The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) creates a "difficult to meet," and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, ––– U.S. ––––, ––––, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (internal citations omitted).

the defense and an additional hearing was held where Petitioner testified. See id. The motion was again denied. See id. The suppression court denied the Petitioner's motion based on Detective Schurman's testimony that Petitioner had been advised of his constitutional rights, he indicated to Detective Schurman that he understood his rights, had been Mirandized [10] twice, and agreed to make an audiotape and hand-written version of his confession. See ECF No. 8-4 at 18. On direct appeal, the Superior Court reviewed the lower court's decision to deny Petitioner's motion to suppress. See id. After reviewing the record of the April 22, 2005 suppression hearing, the Superior Court found that the record supported the lower court's conclusion. See id.

Because Petitioner challenges the state court's factual findings to support its denial of his ineffective assistance of counsel claim, he must demonstrate by "clear and convincing evidence" that the state court's determination of the facts was unreasonable in light of the record. See Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009) ("Under the § 2254 standard, a district court is bound to presume that the state court's factual findings are correct, with the burden on the petitioner to rebut those findings by clear and convincing evidence."). Aside from citing the Supreme Court's decision in Wong Sun v. United States, 371 U.S. 471 (1963), which is markedly different to the case at bar, [11] Petitioner fails to provide *any* evidence, let alone enough to meet § 2254's "clear and convincing" standard, to rebut the state court's factual findings as to the validity of his confession. As such, this Court must presume these findings to be correct.

---

[10] See Miranda, 384 U.S. 436.

[11] In Wong Sun v. United States, 371 U.S. 471 (1963), the United States Supreme Court held that verbal evidence and narcotics recovered during an illegal entry by drug agents must be excluded because both were "fruits" of an illegal entry. However, unlike Wong Sun where evidence led the trial court to determine that the entry was illegal, neither Petitioner's January 16, 2003 homicide arrest nor his subsequent confession were found to be conducted or obtained unlawfully.

16

In this regard, counsel cannot be considered constitutionally ineffective pursuant to Strickland. Therefore, the state court's decision was not "contrary to or an unreasonable application of law," and habeas relief must be denied as to this claim.

C. Ineffective Assistance of Counsel: Prior Bad Acts

In claim three, Petitioner alleges that trial counsel was ineffective for failing to request a limiting or cautionary instruction when the Commonwealth presented evidence of Petitioner's prior bad acts to the jury. See ECF No. 3-1 at 5. Specifically, Petitioner contends that the Commonwealth gave notice of its intentions to introduce evidence regarding Petitioner threatening Devin King four hours preceding the homicide of Holmes with a similar .380 caliber handgun that was determined to have killed Holmes, but that trial counsel never requested a limiting instruction. Id. Additionally, Petitioner argues that his trial counsel failed to ask for limiting instructions regarding the introduction of evidence that Petitioner's cousin, Markita Nixon, shot somebody with a .380 caliber pistol three days before Holmes's homicide, which was prejudicial to Petitioner. Accordingly, Petitioner requests habeas relief based on his counsel's ineffectiveness. See ECF No. 3-1 at 5.

This court may be precluded from reviewing claims under the "procedural default doctrine." Gray v. Netherland, 518 U.S. 152 (1996); Coleman v. Thompson, 501 U.S. 722, 732 (1991); Doctor, 96 F.3d at 678; Sistrunk v. Vaughn, 96 F.3d 666, 678 (3d Cir.1996). The procedural default doctrine precludes federal courts from reviewing a state petitioner's habeas claims if the state court decision is based on a violation of state procedural law that is "independent"[12] of a federal question and "adequate"[13] to support the judgment. Coleman, 501

---

[12] A state rule is independent if it's resolution does not depend on any federal constitutional rulings. Ake v. Oklahoma, 470 U.S. 68, 74 (1985).

17

U.S. at 750. A state's procedural rules are entitled to deference by federal courts and a petitioner's violation of a state procedural rule may constitute an independent and adequate state law ground for denial of federal review of habeas claims under the procedural default doctrine. Id.; Sistrunk, 96 F.3d at 673.

However, a petitioner whose constitutional claims have not been addressed on the merits due to procedural default can overcome the default, thereby allowing federal court review, if he or she can demonstrate either: 1) "cause" for the default and "actual prejudice" as a result of the alleged violation of federal law;[14] or that 2) failure to consider the claims will result in a "fundamental miscarriage of justice."[15] Coleman, 501 U.S. at 750; Carter, 62 F.3d at 595.

Here, the record indicates that Petitioner failed to raise the instant claim in his appeal from the denial of his PCRA petition, see ECF No. 8-11 at 8, thereby failing to exhaust his remedies in state court. In response, Petitioner argues that this Court should excuse any procedural default under the "cause and prejudice" standard. See Coleman, 501 U.S. at 750 (stating that procedural default may be excused if petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law"). Specifically, he

---

[13] State procedural rules are "adequate" to support a judgment unless they (1) are arbitrary, unforeseen, or otherwise deprive the litigant of a reasonable opportunity to be heard, see, e.g., Staub v. City of Baxley, 355 U.S. 313, 319-20 (1958), or (2) impose an undue burden on the ability of litigants to protect their federal rights, see, e.g., Felder v. Casey, 487 U.S. 131, 138 (1988).

[14] To meet the cause standard, a petitioner must demonstrate that some objective factor external to the defense impeded his or her efforts to raise the claim in state court. McCleskey v. Zant, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

To show prejudice, a petitioner must demonstrate that the error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions, not merely that the error created a "possibility of prejudice." Carrier, 477 U.S. at 494.

[15] In order to avail himself or herself of "the fundamental miscarriage of justice" exception to the procedural default rule, a petitioner must make a substantial showing that he or she is actually innocent of the crime for which he or she is incarcerated. Schlup v. Delo, 513 U.S. 298, 324 (1995).

argues that "it was PCRA's counsel's decision not to amend any issues" and that his PCRA counsel's inadequate assistance "in the only proceeding where petitioner could challenge trial counsel's stewardship" justifies excusing the procedural default. ECF No. 4 at 10.

On February 24, 2012, Attorney Pass filed a Motion for Leave to Withdraw as counsel under Commonwealth v. Turner, 544 A.2d 927 (Pa. 1988) and Commonwealth v. Finley, 550 A.2d 213 (Pa. Super. 1988), as well as a thirty-one page brief in support of the motion. See ECF No. 8-8. On February 27, 2012, the PCRA court granted Attorney Pass's Motion to Withdraw. See ECF. No 8-8 at 52. According to the record, the procedural default of this claim did not occur until April 19, 2012, when Petitioner filed a *pro se* Notice of Appeal of denial of PCRA petition to the Pennsylvania Superior Court and failed to include the claim. Since the procedural default occurred when Petitioner represented himself, he cannot rely on his counsel's ineffectiveness to establish cause under the "cause and prejudice" exemption. Furthermore, even though Petitioner offers no argument that a failure to consider this claim will result in a "fundamental miscarriage of justice", see Schlup v. Delo, 513 U.S. 298, 324 (1995), it is clear that it would not result in such since this requires a substantial showing of actual innocence and the evidence presented at trial of Petitioner's guilt leads this Court to have confidence in his conviction. Accordingly, Petitioner has not overcome the procedurally default allowing for habeas review of this claim.

## V. Conclusion

For the reasons set forth above, an Order consistent with this Memorandum Opinion, denying the Petitioner's Writ of Habeas Corpus will be entered.

/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
Chief United States Magistrate Judge

Dated: September 23, 2014

Cc: Joseph Rhone
*Pro Se*

Counsel of Record